IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LATOSHIA C. WELLS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:07CV360-SRW |
| | ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

Plaintiff Latoshia C. Wells brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income and disability insurance benefits under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

On March 23, 2005, plaintiff filed an application for Supplemental Security Income (SSI). On June 7, 2006, after the claim was denied at the initial administrative level, an ALJ conducted an administrative hearing. The ALJ rendered a decision on August 15, 2006, in which he found that plaintiff has severe impairments including status post pancreatic necrosis, diabetes mellitus, exogenous obesity, and headaches. He further found that she

retains the residual functional capacity to perform a significant number of jobs in the regional or national economies and, therefore, that she is not disabled within the meaning of the Social Security Act.  On February 23, 2007, the Appeals Council denied plaintiff's request for review and, accordingly, the decision of the ALJ became the final decision of the Commissioner.

Plaintiff was born on September 6, 1978, and she is presently twenty-nine years old. She alleges that she became disabled on February 28, 2005 due to Type II diabetes and pancreatitis.  (R. 43, 52).  She is five feet, five inches tall and, at the time of the hearing, weighed approximately 220 pounds.  (R. 270).  She worked part-time at a weekend job "doing hair on the side" -- washing, setting and braiding hair --  between 1996 and 2003, and worked as a cashier at a McDonald's restaurant for three weeks in 2001, but did not engage in substantial gainful activity long enough to have "past relevant work" for purposes of the disability analysis.  (R. 52, 271-73, 307-08).  She is not married, has no children, and lives with her mother in Prattville, Alabama.  (R. 270, 70).  She completed tenth grade in regular classes, and is able to read, write, and do simple math.  (R. 271).

Plaintiff testified as follows:  She suffers from chronic fatigue, shortness of breath, dizziness when standing, blurred vision,  headaches, and pain in her abdomen, hand, fingers, and leg.  She has abdominal pain at a level of eight or nine on a scale of ten three days a week.  If she takes something for the pain, it sometimes will pass after an hour or two.  She takes hydrocodone for pain twice a week.  It makes her sleepy for about an hour and a half and does not help the pain all of the time, but it sometimes eases the pain to the point where

plaintiff can function "a little bit."  Because of aches in her hands, she has occasional problems with gross manipulation, but she has no problem with fine manipulation and can feel her fingers.  She can lift five to ten pounds, stand twenty minutes at a time for a total of about three and a half hours in an eight hour day, sit for twenty minutes at a time for a total of about three and a half or four hours during an eight hour day, and walk for twenty minutes at a time for a total of about three and a half hours during an eight hour day.   However, she cannot both walk and stand for three and half hours each during the same day.  She is able to bend "to a certain degree" and is able to stoop. (R. 273-84, 288, 299, 301).

Plaintiff further testified that, even after her cholecystectomy, she continues to have severe abdominal pain two days each week for three and a half to four hours  day.  (R. 288). Plaintiff sought treatment near the end of 2005 when she had severe pain for two or three days which intensified and did not go away.  (R. 290-91).  In May 2006, she went to the hospital after she had unbearable abdominal pain for three days.  (R. 290-91).  Plaintiff has severe headaches once a week which last for about three or four hours, and less severe headaches one or two days a week which last for about an hour and a half.  (R. 293).  She has intermittent "medium" aching pain in her hands two days a week and similar pain in her feet which "travels" up her leg; these pains occur when her blood sugar is high.  She has a prescription for insulin, which she takes properly.  (R. 295-96).  She gets lightheaded after standing for twenty minutes and dizzy after standing for about thirty minutes.  (R. 298).  She lies down about an hour and half or two hours each day, sometimes more and sometimes less. (R. 300).  She is capable of driving, but does not drive because she does not have a driver's

license and has problems with her vision when her "sugar goes up," which is "mostly all day." (R. 302). She does not have chest pain often, and has had it "[m]aybe four or five" times in a fifteen-month period, usually associated with abdominal pain. (R. 303-04).

On February 28, 2005, plaintiff sought treatment at the emergency room for acute abdominal pain, nausea and vomiting. She was diagnosed with gallstone pancreatitis with pancreatic necrosis, and had a cholycystectomy on March 3, 2005. She remained hospitalized until March 22, 2005, and was also diagnosed with diabetes during her hospitalization. (Exhibit F-1). A CT scan performed in a follow-up appointment on April 28, 2005 showed fluid in the pancreatic bed suggestive of pancreatic necrosis. The amount of fluid was reduced significantly by May 25, 2005 and, on June 15, 2005, plaintiff's surgeon discharged her to the care of her primary care physician. (Exhibit F-2).

On April 7, 2006, plaintiff reported to Dr. Alan Babb for a consultative medical examination. She told Dr. Babb that she is unable to work because of headaches, body aches, and erratic blood sugars. Dr. Babb noted his impression as:

> 1. Insulin-dependent diabetes mellitus, unknown medical compliance and control.
> 2. Exogenous obesity.
> 3. Former smoker.
> 4. Microcytic anemia.
> 5. Status post cholecystectomy in 2005 with pancreatitis related to the gallstones. No known active problems.
> 6. History of headaches, unknown etiology.

(R. 219). Dr. Babb concluded:

> At this time I cannot document any specific disability. She says that her real disability relates to the fact that her blood sugars go up and down, but I have no way of knowing what kind of control she has. She really is not having any

4

> kind of medical followup other than that at Lister Hill.  However, at this time
> I cannot document any end organ damage, or any specific physical problems
> that would cause her body aches.  Note that she has not worked in the last two
> years, and apparently never has worked regularly.  However, at this time I
> cannot document any specific medical disability, but we obviously need more
> information concerning her diabetic management and home supervision of her
> diabetes.

(Id.).  Dr. Babb found that plaintiff was able to stand, walk and sit without limitation, that she

could lift and carry thirty pounds constantly, forty pounds frequently, and fifty pounds

occasionally.  He noted no other limitations.  (R. 221-23).

At the administrative hearing in June, plaintiff produced evidence that she had been

admitted to Baptist Medical Center on December 30, 2005 – three months before the

consultative examination – after she reported to the emergency room complaining of

abdominal pain "on and off for two weeks" and after a CT scan was consistent with

pancreatitis.  (Exhibit 7F).  The physician's assessment upon admission was:

1. Pancreatitis with history of gallstone pancreatitis and pancreatic necrosis
2. Intractable abdominal pain secondary to # 1
3. Diabetes Mellitus Type I with hyperclycemia
4. Tobacco use and abuse, NOS
5. Morbid obesity
6. Chest pain, NOS

(R. 228).  After admission, plaintiff was treated with aggressive IV hydration and medication.

Her cardiac telemetry was uneventful, cardiac enzymes were negative, her EKG remained

unchanged, and her chest pain resolved the day after admission. During the admission, she

was found to have anemia and a urinary tract infection.  Plaintiff was discharged on January

1, 2006 with discharge diagnoses of:

1. Pancreatitis, resolved.

    2.  Intractable abdominal pain, improved.
    3.  Diabetes mellitus type-I, stable.
    4.  Tobacco use and abuse NOS.
    5.  Morbid obesity.
    6.  Chest pain at LS, resolved.
    7.  UTI.

(R. 224).  She was discharged in good condition with prescriptions for Lortab as needed for pain, Phenergan as needed for nausea, Levaquin to treat the UTI, iron sulfate for the anemia, and Novolin for the diabetes, and was instructed to follow up with her physician at Montgomery Lister Hill Clinic in one week.  (Id.).

Plaintiff subsequently submitted records of additional emergency room treatment she sought on May 18, 2006 (three weeks before the hearing) and June 13, 2006 (one week after the hearing).  (Exhibit 8F).  On May 18, 2006, plaintiff complained of headache, nausea and of acute abdominal pain on a level of ten on a scale of ten.  Plaintiff was treated with IV morphine and phenergan.  The physician ordered lab testing but found no evidence of pancreatitis, and discharged the plaintiff to return home.  (R. 249-62).  He noted his clinical impression of acute abdominal pain, headache, and Diabetes Mellitus, Type I.

On June 13, 2006, plaintiff again reported to the emergency room, complaining of chest pain and upper abdominal pain on a level of six to seven on a scale of ten.  She stated that she was also nauseous, had shortness of breath, and that her fingers were tingling.  The physician ordered a chest x-ray and lab work, and treated plaintiff with medication. Plaintiff's EKG was normal and the chest x-ray showed "nothing acute."  Four hours after she arrived at the emergency room, plaintiff reported that she was "feeling fine."  The physician found that plaintiff was "not in acute pancreatitis," and that there was "no evidence

6

of ACS [acute coronary syndrome]."  He indicated a clinical impression of chest pain, DM

II and Anxiety NOS.  (R. 231-48).

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The

court does not reweigh the evidence or substitute its judgment for that of the Commissioner.

Rather, the court examines the administrative decision and scrutinizes the record as a whole

to determine whether substantial evidence supports the ALJ's factual findings.  Davis v.

Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145

(11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Cornelius, 936 F.2d at 1145.

Factual findings that are supported by substantial evidence must be upheld by the court.  The

ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity

attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985

F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails

to provide the court with sufficient reasoning for determining that the proper legal analysis

has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

The plaintiff challenges the Commissioners decision, arguing that the ALJ failed to

develop the record properly.  Plaintiff contends that the ALJ should have submitted the

additional evidence she filed after the consultative examination to Dr. Babb, along with

questions regarding whether his assessment of the plaintiff's residual functional capacity was

changed in view of the additional evidence.   Plaintiff argues that "[t]he additional medical evidence repeatedly indicated a diagnosis of diabetes mellitus; furthermore, in the December 29, 2005 to January 2, 2006 hospital record, there is a clear diagnosis of pancreatitis, as well as diabetes mellitus. . . . Additionally, in the records from May and June of 2006, the Plaintiff was diagnosed with headache, abdominal pain, chest pain and anxiety."   (Plaintiff's brief, p. 5).

The court agrees with the Commissioner that the additional medical records did not oblige the ALJ to re-contact Dr. Babb.   While plaintiff points to repeated diagnoses of diabetes mellitus, Dr. Babb was aware of this diagnosis and included it in his assessment of the plaintiff. (R. 216, 219).   Further, although plaintiff was admitted on December 30, 2005 with a diagnosis of pancreatitis, the episode of pancreatitis had resolved by January 1, 2006. (R. 224-25).   This hospitalization occurred before Dr. Babb's consultative evaluation, and plaintiff reported to him that she takes Lortab for abdominal pain.  (R. 216).   Plaintiff points to no diagnosis of chronic – as opposed to acute – pancreatitis, and in treatment notes for plaintiff's emergency room visits on May 18, 2006 and June 13, 2006, the physician expressly ruled out pancreatitis.  (R. 237, 255).   Thus, Dr. Babb was aware that plaintiff had suffered from pancreatitis, that she had diabetes mellitus, and that she took prescription medication for abdominal pain.   The record reveals no medical treatment for the five-month period between April 25, 2005 and September 22, 2005.   The September office visit was for a blood sugar check, and plaintiff then reported that she had no more abdominal pain. (R. 210-11).   Plaintiff's evidence of an episode of acute abdominal pain due to pancreatitis over

three months later, and of two emergency room visits for complaints of pain (in which the physician ruled out pancreatitis) roughly six months after that, does not suggest that she is more limited than Dr. Babb found her to be, and did not require a reassessment of her limitations by the physician.

Additionally, as the Commissioner argues, the ALJ's residual functional capacity assessment is significantly more limited than Dr. Babb's.  Dr. Babb found that plaintiff was able to stand, walk and sit without limitation, and that she could lift and carry thirty pounds constantly, forty pounds frequently, and fifty pounds occasionally.  He noted no non-exertional limitations.  (R. 221-23). The ALJ determined that plaintiff suffers from a moderate degree of pain.  (R. 20).  He further found that:

> [C]laimant has the residual functional capacity to perform light work with a sit/stand option.  She can frequently perform simple grasping. She can continuously perform fine manipulation.  She can occasionally push and pull arm controls.  She can frequently push and pull leg controls.  She can occasionally stoop, crouch, kneel, crawl, climb and reach overhead.  She can never balance.  She can never work around unprotected heights.  She can occasionally work around moving machinery, operate motor vehicle equipment, and exposure to marked changes in temperature and humidity.

(R. 20).

To establish disability, a plaintiff is required to show the effect of an impairment on her ability to work, not merely that she has been diagnosed with an impairment.  Wind v. Barnhart, 133 Fed. Appx. 684, 690 (11th Cir. 2005)(citing McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986)).   Plaintiff points to no evidence of record that she is more

limited in her work-related abilities than found by the ALJ.[1]

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law and, thus, that it is due to be AFFIRMED.  A separate judgment will be entered.

Done, this 17th day of June, 2008.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[1]  Even if the ALJ had found plaintiff to be limited as set forth in his RFC assessment, but with a limitation to sedentary work, the vocational expert testified that such an individual could perform other jobs existing in significant numbers in the region or nation. (R. 20, 312-13).